Leonard PROFFIT, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 36A01–0401–CR–31.

Court of Appeals of Indiana.

Nov. 18, 2004.

Bruce A. MacTavish, Markel Markel Lambring & MacTavish, Pendleton, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Following a jury trial, Appellant, Leonard Proffit, was convicted of one count of Voluntary Manslaughter, a Class A felony,[1] and one count of Robbery as a Class B felony.[2] Upon appeal, Proffit presents three issues for our review, which we renumber and restate as the following two: (1) whether the trial court improperly denied Proffit's motion for a directed verdict upon the robbery charge, and (2) whether the trial court erred in instructing the jury.

We affirm.

The facts most favorable to the convictions reveal that in 1997, Ronald Dale Bruner was a methamphetamine dealer in Jackson County, Indiana. Some time in February of 1997, Bruner's sister, Rhonda Self, went to her brother's house and asked him why he was using and selling methamphetamine. Bruner produced a box full of cash and stated, " 'This is why I do it.' " Transcript at 99. Defendant Proffit had in the past purchased methamphetamine from Bruner, and owed him $2,000. But because of this debt, Proffit was no longer able to purchase metham-

---

1. Ind.Code § 35–42–1–3 (Burns Code Ed. Repl.1998).

2. Ind.Code § 35–42–5–1 (Burns Code Ed. Repl.1998).

phetamine from Bruner. Sometime in February 1997, Eddie Ray Bryant was staying at Proffit's home and overheard Proffit and Johnny Wayt planning a burglary in order to "get some dope and some guns." Tr. at 357.

On the evening of February 27, 1997, Bruner's sister came to Bruner's home and saw him weighing methamphetamine on an electronic scale and placing it into several plastic sandwich bags. Also that evening, Kenneth Beavers stopped by Proffit's home to purchase methamphetamine. Beavers saw Shannon Weber standing outside by a green Ford. Beavers and Weber entered the home where Proffit and Wayt were. Beavers asked Proffit if they had any methamphetamine, but none of them did. Beavers, however, had a small amount, which they proceeded to smoke. The four eventually discussed a burglary, with Weber stating that she could lure Bruner away and that Proffit and Wayt could enter and burglarize Bruner's home to get "[d]rugs and money." Tr. at 537. Doug Scott testified that he accompanied Beavers that night and heard Wayt talking about going to Bruner's and "tak[ing] his money and his meth." Tr. at 384. Proffit eventually telephoned Bruner's pager, and several minutes later received a call from Bruner. Proffit asked Bruner if he could come over to purchase "dope," but Bruner stated that he would not be home for a couple of hours. Tr. at 538. After Proffit had relayed this information to the rest of the group, Beavers "sarcastically" told them, "well, if you are going to do it, now would be the time to do it." Tr. at 538–39. As Beavers realized that they were serious about the burglary, he warned them, "if Bruner catches you, he'll kill you, he'll shoot you." Tr. at 539. Beavers announced that he was going to leave, and Proffit, Wayt, and Weber prepared to leave. Beavers left and went to the home

of another friend looking for more methamphetamine.

Some time later that night, Beavers was driving past Proffit's home when he noticed that "a car was back in there" and that Weber was standing outside. Tr. at 543. Beavers stopped at Proffit's place, hoping that the planned burglary had been successful and that Proffit might now have some methamphetamine. Weber appeared to be nervous, and Beavers felt like she was stalling him and trying to prevent him from going into the house. Weber told Beavers that "things didn't go exactly as planned." Tr. at 543. Once inside, Beavers heard Proffit and Wayt in the back of the house and overheard Proffit tell Wayt in an angry manner, " 'You almost stabbed me, you son of a bitch.' " Tr. at 544. When Beavers asked Weber if she had any methamphetamine, Weber produced "a pretty good size chunk." Tr. at 545.

As Beavers and Weber began to smoke some of the methamphetamine, Proffit came out from the back room holding bloody clothes in his hands and seemed to be surprised to see Beavers. Proffit put the bloody clothes in a brown paper bag. Beavers testified that Proffit put into the bag the shirts and pants that Proffit and Wayt had been wearing earlier. Proffit then went outside and burned the bag in a barrel. When he re-entered the home, Proffit told Beavers to " 'You know what happened here, keep your mouth shut.' " Tr. at 549. When Wayt came out from the back room, he was "pale as a ghost" and told Beavers, "I didn't want to do it, but I had to do what I had to do." Tr. at 550. Beavers also testified that Weber's pocket was bulging with what looked to be money, although he never actually saw what was in her pocket.

Between midnight and 3:00 a.m., Proffit and Weber went to the home of Daniel Goodpaster, who lived near Proffit. Prof-

fit appeared nervous and told Goodpaster, "Old Boy in Vallonia" was dead, referring to Bruner, but claimed not to have killed Bruner. Tr. at 410. At approximately 7:00 a.m., James Hyde came by Proffit's home and observed that Proffit was acting nervously. Proffit immediately told Hyde, "this wouldn't be a very good safe place to be." Tr. at 401. When Hyde asked what he meant by this, Proffit stated that "somebody killed Ronnie Bruner and that . . . the police was going to be all over that place before long." Tr. at 402. Yet Proffit claimed that he "didn't do nothing." Tr. at 402.

At around 8:00 a.m., George Lebline arrived at Proffit's place to finish the work he and his brother-in-law Don Kirts had been doing to the home. Around noon, Lebline went to his house and called Kirts to tell him that he needed supplies. Kirts told Lebline that he would meet him at Bruner's house at about 12:30 p.m. Kirts was a longtime friend and distant cousin of Bruner and was also involved with using and selling methamphetamine with Bruner. When Kirts arrived, he knocked on Bruner's door but got no response. Kirts also knocked on Bruner's bedroom window, thinking that Bruner might be asleep. Kirts still got no response, so he let himself in the side door using a key he had to the house. Once inside, Kirts yelled for Bruner, but no one answered. Kirts headed for the bedroom, stepping over blankets that were on the kitchen floor. Kirts looked into the bedroom and noticed that it had been ransacked. Kirts then noticed blood on the floor and pulled the blankets back, discovering Bruner's body. Kirts told Lebline that Bruner was dead and told him to telephone the police. Bruner had previously told Kirts that "if anything ever happened," that Kirts was to get the drugs and money out of the house. Tr. at 176. Kirts searched the home to make sure that "nothing incriminating" was there. Tr. at 174. Kirts knew where Bruner kept things hidden, and looked for drugs but found only a digital scale on top of one of the drawers which had been pulled out and turned upside down. Kirts placed the scale in his truck but turned it over to the police when asked later that day.[3]

Around the time of Bruner's death, Proffit obtained methamphetamine from Eric Chadwell by trading tools and a diamond ring. Chadwell's girlfriend testified that the ring was engraved with the initials "R.D.B."[4] Tr. at 373. After Bruner's death, Proffit told a friend, Kenneth Collins, that "they went to Ronnie Bruner's house in Vallonia and broke in. . . ." Tr. at 512. Collins, who did not yet know of Bruner's death, told Proffit that he did not want to know any more about what Proffit was telling him.

While in jail, Eddie Bryant, who had earlier overheard Proffit and Wayt planning a burglary, heard that Bruner was dead. He called Proffit and asked him if he had killed Bruner. Proffit just hung up on Bryant. Later, after Bryant was released from jail, he went to Proffit's house. Proffit was drunk and weeping and after being asked about Bruner's death, told Bryant that "he'd done some things he wished he'd never done. . . . [T]here's [sic] things that went wrong with him. . . ." Tr. at 362.

At some point after the killing, up to two years later, Proffit was speaking with Goodpaster and told him that the police had been questioning Weber regarding the

3. Kirts had apparently told Bruner's brother-in-law that he had taken the scale, and the brother-in-law then told the police.

4. R.D.B. were the initials of the victim, Ronald Dale Bruner.

Bruner investigation. Proffit stated that the police had offered Weber protection if she would "point a finger at somebody that was connected to the murder...." Tr. at 416. Proffit told Goodpaster that he warned Weber that if she did so, "she'd be in trouble." Tr. at 416.

During the course of the investigation, the police spoke with Proffit's brother. Proffit afterward asked his brother what he had told the police and whether the police had seen his knife, which was identical to one owned by Proffit. In the summer of 2003, Proffit was being held in jail and told another inmate, Clay Easley, that the police were searching for a knife, but that he had gotten rid of it a long time ago. Proffit also told Easley that he had been at Bruner's house, and although he could not remember what happened, "he woke up there one morning and Mr. Bruner was dead," and Proffit had blood on his pants. Tr. at 440–41. Proffit also told Easley that his "cut" was $20,000, and that he was worried that someone might have seen him leave his house the night of the killing. While in jail, Proffit also spoke with another inmate, James Hyde, who had seen Proffit on the morning after the killing. Proffit was going to be released from jail soon and told Hyde that "[we] beat the system." Tr. at 391.

Some time later, the police dredged a pond behind Proffit's home, looking for knives. Proffit thought this was "funny" and told a friend, James Kriete, that "they weren't going to find them there." [5] Tr. at 464. A few weeks after Proffit was released from jail,[6] Kriete saw Proffit at the home of a mutual friend. Proffit had been drinking and was sobbing. Proffit was cleaning a gun and brandishing it, stating that he was in fear for his life because there were people who wanted to kill him for "everything that's going on." Tr. at 466. Kriete tried to allay Proffit's fears, telling him, "if they had anything on you they'd end up keeping you there anyway, you know, ... they don't just let people out of jail for stuff like this." Tr. at 466. Proffit was nonetheless still upset and began to talk about Bruner's death. As Kriete testified at trial, "[Proffit] just knew that he'd been there that night and the only thing that they might have is fingerprints on him, of his on the door and the actual hand that done [sic] the stabbing." Tr. at 467.

Proffit then told Kriete the details of what happened the night that Bruner was killed. Proffit, Wayt, and a person referred to as "Wilson" had met at Proffit's house and they went to Bruner's house to "get the meth that night." Tr. at 468–69. Bruner apparently confronted Proffit about some tools that were missing, and an argument ensued. Bruner grabbed Proffit, and Wayt held Bruner and told Proffit to "get the knife." Tr. at 469. Proffit got a knife from the kitchen and began to stab Bruner. The knife broke as he stabbed Bruner, and Bruner "went crazy." Tr. at 470. Wayt told Proffit to "grab your buck [7], that'll do it." Tr. at 470. Proffit did and continued to stab Bruner. As Proffit stabbed Bruner in the chest, Bruner began to bleed and fell to the floor. Wayt yelled for Wilson, who had been

---

**5.** The record is not clear as to when Kriete spoke with Proffit. What is clear is that it was a considerable time after Bruner's killing, as Kriete testified that he first met Proffit in October of 2002.

**6.** It is also not entirely clear when Proffit was released from jail. However, Easley testified that he spoke to Proffit when both were in jail, and it appears that Easley was in jail in the summer of 2003.

**7.** This is an apparent reference to a buck knife.

elsewhere in Bruner's house, to come and help them. Proffit, Wayt, and Wilson "got their stuff," left, and returned to Proffit's house. Tr. at 471.

An autopsy revealed that Bruner had been stabbed approximately twenty-two times. Bruner died from blood loss after his ascending aorta was torn by a knife which penetrated the ribcage. Bruner also sustained stab wounds to his neck, lungs, and had defensive wounds on his arms.

On July 2, 2003, a grand jury indicted Proffit for murder and robbery. A jury trial was held on October 27 through October 30, 2003. At the conclusion of the State's case-in-chief, Proffit moved for a directed verdict upon the robbery charge, which the trial court denied. The jury found Proffit guilty of voluntary manslaughter as a Class A felony and robbery as a Class A felony. At the sentencing hearing, held on December 19, 2003, the trial court reduced the robbery conviction to a Class B felony because of double jeopardy concerns and imposed a sentence of forty-five years on the voluntary manslaughter conviction and ten years on the robbery conviction, to be served consecutively. Proffit filed a notice of appeal on January 15, 2003.

## I

### Directed Verdict / Sufficiency of the Evidence

 Proffit claims that the trial court erred in denying his motion for a directed verdict upon the robbery charge. For a trial court to appropriately grant a motion for a directed verdict, there must be a total lack of evidence regarding an essential element of the crime, or the evidence must be without conflict and susceptible only to an inference in favor of the defendant's innocence. *Barrett v. State*, 634

N.E.2d 835, 837 (Ind.Ct.App.1994). If the evidence is sufficient to sustain a conviction upon appeal, then a motion for directed verdict is properly denied. *Id.* Thus, our standard of review is essentially the same as that upon a challenge to the sufficiency of the evidence. *See id.; Wilcox v. State*, 664 N.E.2d 379, 382 (Ind.Ct.App. 1996). Upon review of claims of insufficient evidence, we neither reweigh evidence nor judge witness credibility. *Kien v. State*, 782 N.E.2d 398, 407 (Ind.Ct.App. 2003), *trans. denied.* We will instead consider only the evidence which supports the conviction and the reasonable inferences to be drawn therefrom in order to determine whether there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt. *Id.*

The crime of robbery is defined by statute as follows:

"A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1) by using or threatening the use of force on any person; or

(2) by putting any person in fear;

commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than a defendant, and a Class A felony if it results in serious bodily injury to any person other than a defendant." I.C. § 35–42–5–1.

 Proffit argues that there was no evidence that he intended to take property by force or do violence to Bruner when he went to Bruner's home. Intent is a mental state and may be inferred from circumstantial evidence. *Sinks v. State*, 235 Ind. 484, 488, 133 N.E.2d 563, 564 (1956) (direct evidence of the intent to commit robbery

was not essential but could be inferred from circumstantial evidence); *Moses v. State*, 170 Ind.App. 451, 456, 352 N.E.2d 851, 854 (1976) (criminal intent to commit robbery may be inferred from the surrounding circumstantial evidence). Proffit does not deny that there was evidence indicating that he and his cohorts were planning to burglarize Bruner's home. He appears to argue that there was no evidence that he planned to rob Bruner. This is not the relevant question; the question is whether there was evidence that he knowingly or intentionally took property from Bruner or the presence of Bruner by the use of force. That he may have only been planning to burglarize Bruner's home and ended up killing and robbing him is of no moment.

Here, the evidence reveals that a burglary was planned by Proffit, Wayt, and Weber. Obviously things did not go as planned, because Bruner was at home and an argument ensued. The argument led to Proffit stabbing Bruner while Bruner was held by Wayt, with Wilson apparently in another part of the house. After Bruner collapsed to the floor bleeding, Proffit and his accomplices "got their stuff." Tr. at 471. Before the killing, Proffit and his friends had no methamphetamine to share with Beavers. Shortly thereafter, they had a "pretty good size chunk." Tr. at 545. Also, Weber had a bulge in her pocket which appeared to be money. Proffit, when speaking to Easley about the Bruner killing, stated that his "cut" was $20,000. The evening of his death, Bruner was seen with a substantial amount of methamphetamine in his house. When Bruner's body was found by his friend Kirts, Bruner's bedroom had been ransacked. Kirts, who knew where Bruner kept things hidden, searched for drugs and money but found only a digital scale. Proffit later traded a ring, engraved with Bruner's initials, for methamphetamine. From this evidence, the jury could reasonably infer that Proffit knowingly took property from Bruner or the presence of Bruner by the use of force.[8] *See* I.C. § 35–42–5–1.

Proffit also argues that, because the evidence indicates that Bruner was killed before any property was taken, he cannot be convicted of robbery, which requires a taking by force or threat of force from another or from the presence of another. Proffit attempts to distinguish the case at bar from the facts present in *Robinson v. State*, 693 N.E.2d 548 (Ind.1998), wherein the defendant planned to kill one Hobbs, a fellow drug dealer, so that he could "move up" in the local drug trade and make more money. Robinson eventually shot and killed his rival during a struggle in the victim's car. Robinson and his accomplice drove the victim's car three miles from the site of the shooting, dragged the body into a field, and despoiled the body of drugs and money. Upon appeal from his convictions for murder and robbery, Robinson claimed that there was insufficient evidence to support his robbery conviction because the victim was already dead when the property was taken from him, and that the robbery statute requires that the property be taken from another person or the presence of another person. According to Robinson, a dead man was not a person for purposes of the robbery statute. Our Supreme Court rejected this contention, holding that "[t]he record contain[ed]

---

8. Proffit briefly claims that the only evidence regarding what occurred in Bruner's home establishes that Bruner attacked Proffit before Proffit stabbed Bruner. This is simply an invitation to reweigh evidence, which we will not do. Regardless, this does not diminish the evidence establishing that Proffit stabbed, killed, and took property from Bruner. Moreover, Proffit did not present a justification defense at trial.

abundant evidence that the taking of Hobbs' property was effectuated by the use of force against him while he was still alive. That Robinson waited until after Hobbs' death actually to take the property is of no moment." 693 N.E.2d at 554. The same is true here. Proffit was planning to burglarize Bruner's home and steal drugs, money, and guns. Somehow, the planned robbery resulted in a confrontation between Bruner and Proffit during which Proffit stabbed and killed Bruner. That Proffit and his accomplices took Bruner's property after Bruner was killed does not diminish the fact that the taking was effectuated by the use of force against Bruner while he was alive. *See id.* That the defendant in *Robinson* had planned to kill and rob the victim, whereas Bruner only planned a burglary and theft, is irrelevant.

Proffit also unsuccessfully attempts to distinguish his case from *Ortiz v. State,* 716 N.E.2d 345 (Ind.1999). In that case, the defendant's adopted mother was found dead in her bed, strangled and beaten with a sledgehammer, and her car was missing from the garage. Ortiz was not at home and had spent the day driving friends in the victim's car and using her credit cards. The victim's blood was found on Ortiz's clothes and shoes, and the blood spatter on the clothes was consistent with the clothes having been worn on the night of the murder. Upon appeal to our Supreme Court, Ortiz challenged the sufficiency of the evidence supporting his robbery conviction. The evidence revealed that the credit cards were taken from the victim's purse located in the kitchen and that the car was taken from her garage, whereas the victim was killed in her bedroom while she was likely asleep. Ortiz therefore argued that the property was not taken from the victim's person or presence. The *Ortiz* Court rejected this contention, holding that the jury could have reasonably in-

ferred that Ortiz's beating of his mother with the sledgehammer prevented her from retaining control over her property and the fact the property was taken from a different room did not undermine the sufficiency of the evidence to support the robbery conviction. *Id.* at 351–52. Similarly here, although the evidence indicates that Proffit and his accomplices might not have taken property from the immediate presence of Bruner, by stabbing and killing Bruner, Proffit prevented Bruner from retaining control over his property located in other parts of the home. *See id.*

Proffit's claim that his case is similar to that presented in *Kimbrough v. State,* 622 N.E.2d 230 (Ind.Ct.App.1993), is also unavailing. In that case, the defendant was driving with friends when they saw three other young men with whom they had an ongoing dispute. The defendant exited the car and chased one of the other men, Rainey, and engaged him in a fight. Immediately before the fight, Rainey had purchased some drinks and snacks, but when he got home after the fight with Kimbrough, those items were missing from his pockets. Upon appeal, this court held that the evidence did not support the robbery conviction. *Id.* at 231. Rainey did not feel anyone going into his pockets or taking his property during the fight. *Id.* Therefore, the court held that the evidence did not support a reasonable inference that Kimbrough or one of his friends took Rainey's property from him by force or the threat of force. *Id.* In essence, there was no evidence that any property was taken from Rainey. Here, unlike in *Kimbrough,* there is evidence that Proffit took property from Bruner's house after he was killed. This evidence has been detailed, and we need not repeat it here. Suffice it to say that the facts before us are distinguishable from those present in *Kimbrough.* In summary, the evidence is sufficient to sup-

port Proffit's conviction for robbery. Therefore, the trial court did not err in denying his motion for a directed verdict at the close of the State's case-in-chief.

## II

### *Jury Instructions*

 Proffit contends that the trial court erred in instructing the jury. The manner of instructing the jury is left to the sound discretion of the trial court, and we will reverse only if the court abuses that discretion. *Smith v. State*, 777 N.E.2d 32, 34 (Ind.Ct.App.2002), *trans. denied*. An abuse of discretion occurs if the instructions, considered as a whole and in reference to each other, misstate the law or otherwise mislead the jury. *Id.* Proffit specifically attacks final instructions number eleven and twelve, which instructed the jury regarding conspiracy. Final instruction number eleven reads:

"Under Indiana law, conspiracy is defined as follows:

A person conspires to commit an offense when, with intent to commit that offense, he agrees with another person or persons to commit the offense, and any of those persons commits an overt act in furtherance of their agreement." Appendix at 334, 349.

Final instruction number twelve reads:

"Each party to a conspiracy is responsible for all acts performed by his co-conspirators in furtherance of the conspiracy." *Id.* at 333, 350.

Proffit notes that he was not charged with conspiracy, and that a conviction for a crime which is not charged, and which is not a lesser-included offense of the crime charged, constitutes denial of due process of law. *See Lechner v. State*, 439 N.E.2d 1203, 1205 (Ind.Ct.App.1982) [9] (finding fun-

damental error and reversing conviction for child molesting because it was neither an offense alleged in the charging information nor a lesser-included offense of the charged crime).

Here, although Proffit was not charged with conspiracy, neither was he convicted of conspiracy. In the cases cited by Proffit, the defendant was *convicted* of a crime which was not charged. *See Nelson v. State*, 479 N.E.2d 48 (Ind.1985) (reversing conviction where, despite the fact that the defendant was charged with felony murder, the trial court instructed the jury regarding voluntary manslaughter and jury convicted defendant thereof); *Peek v. State*, 454 N.E.2d 450 (Ind.Ct.App.1983) (reversing conviction for battery as a Class C felony as a lesser-included offense of robbery, where charging information alleged only bodily injury, not serious bodily injury as required for a conviction for battery as a Class C felony); *Lechner*, 439 N.E.2d at 1205 (reversing conviction for child molestation for fondling or touching where defendant was charged with attempted child molesting by performing or submitting to sexual intercourse or deviate sexual conduct because the former crime is not a lesser-included offense of the latter). Because Proffit was not convicted of conspiracy, we are unable to agree with him that the jury instructions amounted to a denial of due process.

Nevertheless, Proffit claims that the instructions prejudiced him in that it confused the jury as to what he was charged with and guilty of. A similar argument was rejected by our Supreme Court in *Martin v. State*, 457 N.E.2d 1085 (Ind. 1984). The challenged instructions in *Martin* read:

---

**9.** In his brief, Proffit varyingly refers to *Lechner* as an opinion of the Indiana Supreme Court. Clearly, however, it is an opinion of this court.

" 'The Court instructs you that where two or more persons knowingly combine to commit a crime, each is criminally responsible for the acts of his confederates committed in furtherance of the common design.'

* * *

'It is not necessary for the State to prove that the defendant personally committed each and every act involved in the commission of the offense charged once the state proves the defendant acted in concert with another participant. Therefore, it is not necessary that the State prove the defendant personally inflicted serious bodily injury on Mr. Lederman, as long as the State proves beyond a reasonable doubt that such an injury resulted from the robbery itself, even though inflicted by the other participant.' " *Id.* at 1087.

Martin argued that the given instructions effectively charged him with conspiracy, a crime he was not charged with, and that the instructions were misleading in that the jury could believe that the mere presence of a person at the scene of the crime could lead to his conviction. Rejecting the defendant's argument, the *Martin* court held:

"*Even when conspiracy is not charged, if the evidence shows that more than one person acted in concert to commit a crime, the acts of an accomplice are chargeable to others acting in concert to establish that all of the elements of the offense were committed;* thus, the instructions provide correct statements of the law. Further, the first instruction was expressly approved in *Williams v. State,* (1976) 265 Ind. 190, 203–204, 352 N.E.2d 733, 744 and *Bailey v. State,* (1982) Ind.App., 438 N.E.2d 22, 24, (transfer denied), and both instructions were approved, in essence, in *Banks v.*

*State,* (1976) 265 Ind. 71, 93, 351 N.E.2d 4, 18, *cert. denied* 429 U.S. 1077, 97 S.Ct. 821, 50 L.Ed.2d 797 and *Pulliam v. State,* (1976) 264 Ind. 381, 391–392, 345 N.E.2d 229, 238. Neither do we find the instructions to be confusing or misleading." *Martin,* 457 N.E.2d at 1088 (emphasis supplied) (citations omitted).

Based upon the authority of *Martin,* we also reject Proffit's claims that the jury instructions at issue here were improper. Proffit attempts to distinguish his case from *Martin* and *Williams v. State,* 265 Ind. 190, 352 N.E.2d 733 (1976), cited by *Martin,* because in neither of those cases, Proffit argues, did the instructions "relate to the crime of conspiracy." Appellant's Brief at 41. It does not appear that in *Martin* or *Williams* that the jury was given the statutory definition of conspiracy, as was done in the present case. However, the very argument of the defendant in *Martin* was that the instructions amounted to a charge of conspiracy, an uncharged crime, and the Court found no reversible error. 457 N.E.2d at 1088.

We also find important that although the jury here was instructed regarding the definition of the uncharged crime of conspiracy, it was *not* given the option of convicting Proffit of conspiracy. The jury was given only the options of convicting Proffit of murder/voluntary manslaughter and robbery. Considering the jury instructions as a whole and in reference to each other, we cannot conclude that the jury instructions misstate the law or otherwise misled the jury.

Proffit also contends that final instructions numbers eleven and twelve unduly emphasize one evidentiary fact. Specifically, he claims that by instructing the jury regarding conspiracy, the trial court unduly emphasized the one State witness, Kenneth Beavers, who Proffit claims was the only witness who testified to the con-

spiracy. Proffit, however, never made this argument to the trial court when objecting to these instructions. Instead, he objected to instruction number eleven upon the grounds that conspiracy was not charged and that the instructions would "not relate to the issues of this case and ... will distract the jury from the true issues." Tr. at 698. The objection to instruction number twelve was substantially the same. By not objecting to the instructions upon the grounds he now argues upon appeal, Proffit has waived this claim of error.[10] *See Luna v. State,* 758 N.E.2d 515, 518 (Ind.2001) (where defendant failed at trial to state the ground for her objection which she asserted upon appeal, she waived her ability to raise it upon appeal). In summary, Proffit has not established that the trial court abused its discretion in instructing the jury.

The judgment of the trial court is affirmed.

NAJAM, J., and BARNES, J., concur.

---

**10.** Even if we were to consider Proffit's argument, he would not prevail. First, Beavers was not the only witness whose testimony supported the existence of a conspiracy. Eddie Bryant testified that several days before Bruner was killed, he heard Wayt and Proffit talking about a planned burglary to get "dope and some guns." Tr. at 357. Doug Scott testified that he heard Wayt talking at Proffit's home about going to Bruner's and "tak[ing] his money and his meth." Tr. at 384. More-over, the instructions at issue here, unlike the "flight" instruction disapproved of by our Supreme Court in *Dill v. State,* 741 N.E.2d 1230 (Ind.2001), do not unduly emphasize one evidentiary fact. Instead, they simply define conspiracy and explain that a party to a conspiracy is responsible for acts of co-conspirators in furtherance of the conspiracy, which Proffit does not challenge as incorrect statements of the law.