**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 29 2012, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KIMMERLY A. KLEE**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANTONIO RUSH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1106-CR-537 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Steven R. Eichholtz, Judge
Cause No. 49G20-1003-FA-023469

**February 29, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

Antonio Rush ("Rush") was convicted of one count of Dealing in Cocaine, as a Class A felony,[1] and one count of Driving while Suspended, as a Class A misdemeanor.[2] He now appeals his convictions.

We affirm.

## Issues

Rush raises three issues for our review, which we restate as:

I. Whether hearsay testimony admitted by the trial court from Rush's co-defendants violated his Sixth Amendment confrontation rights under Bruton v. United States, 391 U.S. 123 (1968);

II. Whether there was sufficient evidence to support his conviction for Dealing in Cocaine; and

III. Whether the trial court erred when it ruled against his Batson challenges to the State's peremptory striking of two African Americans from the venire.

## Facts and Procedural History

In the early morning hours of March 8, 2010, Rush's brother, Antwan Rush ("Antwan"), was driving a blue Trailblazer on 38th Street in Indianapolis, when Officer Travis Hunter ("Officer Hunter") observed that the vehicle had a cracked taillight. Officer Hunter initiated a traffic stop and learned that Antwan's driving privileges had been suspended. Antwan was arrested, an inventory search of the Trailblazer was conducted, and the vehicle was towed from the scene to an impound yard.

---

[1] Ind. Code § 35-48-4-1.
[2] I.C. §§ 9-24-19-1 & -2.

Also on March 8, 2010, Detective Matthew Stevenson ("Detective Stevenson") of the Indianapolis Metropolitan Police Department's Violent Crimes Unit ("VCU") sought to make contact with Antwan in the course of an ongoing investigation in an unrelated matter. Detective Stevenson learned that Antwan was at the Marion County Jail's Arrest Processing Center ("APC"), but Antwan was released from the APC before Detective Stevenson could make contact with him. Detective Stevenson requested that other members of the VCU place Antwan under surveillance as he walked through downtown Indianapolis. The detectives were able to observe Rush for only a brief period before losing sight of him.

While VCU detectives attempted on-foot surveillance of Antwan, Detective Stevenson learned of several Indianapolis addresses connected to Antwan. Among these were a unit in a duplex on North Carrollton Avenue ("4210 Carrollton") and an apartment on the northeast side of the city ("the San Paulo apartment"). Detective Stevenson requested that VCU detectives place both locations under surveillance that afternoon after the VCU team lost sight of Antwan in downtown Indianapolis. Detectives Jean Deddish ("Detective Deddish"), Steven Scott ("Detective Scott"), Tanya Terry ("Detective Terry"), and Henry Gregory ("Detective Gregory") conducted surveillance of 4210 Carrollton. Detective-Sergeant Kerry Buckner ("Sergeant Buckner") conducted surveillance of the San Paulo apartment. Detective Stevenson remained mobile and coordinated the surveillance operations.

During the afternoon of March 8, the detectives observed a white Chevrolet Malibu with a paper license tag drive from 4210 Carrollton to a nearby Walgreen's drug store and back to the duplex. While the Malibu was parked at the Walgreen's store, Rush exited the

3

car, entered the store, purchased a box of latex surgical gloves, and got back in the car, which then returned to 4210 Carrollton. At one point in the afternoon after the white Malibu had returned from the Walgreen's store, Antwan emerged from 4210 Carrollton and stood next to the car for several minutes before returning to the interior of the house. Detectives also saw an individual they would later identify as Ronyai Thompson ("Thompson") twice drive to the duplex in a black Dodge Charger and enter 4210 Carrollton. There was very heavy foot and vehicular traffic to and from 4210 Carrollton that was uncharacteristic of the neighborhood—by one detective's estimate, nearly thirty-five persons—with each person remaining at the residence for only a few minutes before leaving. Detectives recognized this conduct as characteristic of individuals purchasing drugs from the occupants of 4210 Carrollton.

While VCU detectives maintained surveillance on 4210 Carrollton, Detective Stevenson and Detective Michael Condon ("Detective Condon") went to an impound yard to examine the Trailblazer Antwan had been driving when he was arrested earlier that day. The inventory search of the vehicle at the time of Antwan's arrest had yielded no contraband, but upon approaching the vehicle both detectives detected the scent of raw marijuana. After requesting a canine sniff and that the Trailblazer be towed to a secured IMPD facility, Detective Stevenson left Detective Condon with the vehicle and returned to the neighborhood near 4210 Carrollton.

At around 4:30 that afternoon, Detective Stevenson requested that several of the detectives conducting surveillance on both the Carrollton and San Paulo locations meet at the Indiana State Fairgrounds to discuss a plan for making contact with Antwan and any other

4

individuals at 4210 Carrollton. As the detectives prepared to leave the Fairgrounds, a member of the surveillance team reported that the white Malibu was leaving 4210 Carrollton.

Detective Stevenson requested that uniformed police officers stop the car, and he and several other detectives traveled to the scene of the traffic stop. When police stopped the vehicle, they found Rush driving the car with Antwan in the passenger's seat. Each had large sums of cash on his person.

While the traffic stop was under way, Detectives Scott and Gregory approached the front of 4210 Carrollton. Sergeant Buckner and two other detectives placed themselves at the back of the building to ensure no one left undetected. Detective Gregory knocked on the front door in an attempt to make contact with any individuals inside, while Detective Scott stood next to him. After receiving no reply, Detective Gregory knocked louder. He and Detective Scott heard loud noises coming from inside the house. Shortly after this, Ronyai, still inside the residence, opened a space in the blinds to see who was at the door. After Ronyai saw Detective Scott, he snapped the blinds closed. The detectives heard further noise from inside the house, including Ronyai's voice, but no one came to the door.

While Detectives Gregory and Scott stood at the door of 4210 Carrollton, Patricia Thompson ("Patricia"), mother of Rush and Antwan and Ronyai's aunt, arrived by car at the house and explained that she had a contractual interest in the duplex. Detective Gregory and Detective-Sergeant Garth Schwomeyer ("Sergeant Schwomeyer"), another VCU member, spoke with Patricia and requested her consent to enter the house; Patricia refused.

Knowing that older duplexes like the one at 4210 Carrollton often allowed attic access

5

to the adjacent unit in the building, Detective Gregory knocked on the door of the other unit in the duplex, 4212 Carrollton. One of its occupants admitted him to the residence. Detective Gregory explained that police suspected criminal activity in 4210 Carrollton, and obtained identification information from the occupants of 4212 Carrollton. After advising the occupants to remain inside for their safety, Detective Gregory left 4212 Carrollton. Among those in 4212 Carrollton was Ronyai, who had identified himself to Detective Gregory as Sam Jones and provided a date of birth and social security number.

Detective Gregory ran each of 4212 Carrollton's occupants names through police computers and determined that the information Ronyai provided was false. At some point after Detective Gregory left the house, a male occupant of the house emerged, asked to smoke a cigarette, and returned to the interior of 4212 Carrollton after finishing the cigarette. Soon after this, Ronyai, accompanied by a female adult, left the house carrying a child in his arms. Detective Gregory called Ronyai over to ask him about the false identification information he had provided. After handing the child over to his female companion, Ronyai provided correct identification information. Detective Gregory checked the correct information in police computers and determined that Ronyai's driving privileges had been suspended. Because detectives had seen Ronyai driving the black Dodge Charger earlier that day, Detective Terry arrested him.

In the interim, Detective Stevenson sought and obtained search warrants for 4210 Carrollton, the San Paulo apartment, the Trailblazer, and Patricia's vehicle. During their search of 4210 Carrollton, police found drug-related items and weapons throughout the first

6

floor of the house, including 281.243 grams of powder cocaine and 90.639 grams of crack cocaine; cooking pans with cocaine residue; numerous rubber gloves and plastic baggies, several of which contained crack cocaine; a twenty-gauge shotgun and shotgun shells; and a loaded .38 Special revolver. Police also found, in the second floor of the house, a panel allowing access into the shared attic between 4210 Carrollton and 4212 Carrollton, which permitted Ronyai to move between the two units in the duplex while avoiding police observation.

Detective Condon and Sergeant Schwomeyer returned to their office to conduct a search of the Trailblazer, which had been locked in a secured bay at an IMPD facility. Sergeant Schwomeyer searched the vehicle, including "void areas" in the console behind the glove box. (Tr. 762.) In one of these areas, Sergeant Schwomeyer discovered 62.8915 grams of powder cocaine, 16.224 grams of crack cocaine, and 2.15 grams of marijuana.

On March 23, 2010, the State charged Rush with Conspiracy to Commit Dealing in Cocaine, as a Class A felony[3]; Dealing in Cocaine, as a Class A felony; Possession of Cocaine, as a Class C felony[4]; Possession of Cocaine and a Firearm, as a Class C felony[5]; Carrying a Firearm without a License, as a Class A misdemeanor[6]; and Driving while Suspended, as a Class A misdemeanor.[7] Antwan, Ronyai, and Patricia were charged with related offenses.

---

[3] I.C. §§ 35-41-5-2 & 35-48-4-1.
[4] I.C. § 35-48-4-6.
[5] I.C. § 35-48-4-6.
[6] I.C. § 35-47-2-1.
[7] I.C. § 9-24-19-2.

On April 18, 2011, the State moved to dismiss the charge of Carrying a Firearm without a License, which the trial court granted that day. The trial court also conducted jury selection on April 18, 2011. During voir dire, the State peremptorily challenged two African-American jurors from the venire. The trial court raised sua sponte whether the State's peremptory challenges discriminated against the potential jurors under Batson v. Kentucky, 476 U.S. 79 (1986). After the trial court granted the State's challenges, Rush and the other defendants objected, and the trial court overruled the objections. On April 29, 2011, Rush and the other defendants filed a joint motion for mistrial based upon the alleged Batson violations.

A jury trial was conducted from May 2, 2011 to May 6, 2011. During the trial, Rush objected on several occasions to hearsay statements regarding his relationship to his co-defendants, pointing to the rule against co-defendant incrimination on confrontation grounds as articulated in Bruton v. United States, 391 U.S. 123 (1968). The trial court overruled each of these objections.

After the close of the State's evidence, all four defendants moved for judgment on the evidence. The trial court granted Patricia's motion and dismissed all the charges against her, but denied the others' motions. On May 6, 2011, the jury found Rush guilty of all the remaining charges.[8]

On May 31, 2011, the trial court entered judgments of conviction against Rush for Dealing in Cocaine, sentencing him to thirty-five years imprisonment, and Driving while

---

[8] Antwan and Ronyai were also found guilty of numerous charges.

Suspended, sentencing him to 180 days of imprisonment; the sentences were run concurrent to one another.

This appeal followed.

**Discussion and Decision**

<u>Hearsay Statements of Co-Defendants</u>

Rush contends that the trial court improperly admitted into evidence hearsay testimony from various law enforcement witnesses regarding statements made by his co-defendants. Rush argues that statements alleged familial relationships between him and his co-defendants that he claims tended to implicate him in the charged offenses. Because Rush's co-defendants did not testify, he was not afforded the opportunity to cross-examine them with respect to these statements. Thus, he asserts that the trial court's admission of this evidence violated his Sixth Amendment confrontation rights.

The Sixth Amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with witnesses against him." In <u>Bruton v. United States</u>, 391 U.S. 123 (1968), the United States Supreme Court held that "in a joint trial, admission of one defendant's confession that implicates another defendant is a violation of the second defendant's Sixth Amendment right to confront witnesses." <u>Fayson v. State</u>, 726 N.E.2d 292, 294 (Ind. 2000) (citing <u>Bruton</u>, 391 U.S. at 124-26). The confessing defendant cannot be compelled to testify, and thus a denial of the right to cross-examine an accuser results from admission of the confession into evidence. <u>Id.</u> (citing <u>Bruton</u>, 391 U.S. at 137).

9

In order for a <u>Bruton</u> violation to have occurred, the statement must facially incriminate the affected defendant and be admitted into evidence at a joint trial. <u>Id.</u> (citing, inter alia, <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987)). It is not necessary that the statement be "as devastating … as the prototypical <u>Bruton</u> problem – a confession by a co-defendant that details the commission of the crime and the objecting defendant's role in it." <u>Id.</u> Nevertheless, even statements that refer in some manner to an objecting defendant must still bear "reference" to facts that "form[] the basis of the charges against" the defendant. <u>Brock v. State</u>, 540 N.E.2d 1236, 1240 (Ind. 1989) (holding no <u>Bruton</u> violation occurred where Brock's co-defendant told police that they were lucky "we" did not decide to resist the police with the large number of firearms present in the house and Brock and co-defendant were only two of a number of occupants). Harmless error analysis applies to a claim of a <u>Bruton</u> violation. <u>Fayson</u>, 726 N.E.2d at 294-95.

Here, Rush contends that while <u>Bruton</u> is "not dispositive," its "rationale" applies in his case (Appellant's Reply Br. 5), because hearsay statements from his co-defendants "alleged familial relationships between the parties" that prejudiced his defense by allowing the jury to "fill obvious gaps" in the State's case. (Appellant's Reply Br. 6.) Each of the statements, the admissibility of which Rush challenged at trial and again challenges on appeal, related to the identity of one or more of Rush's co-defendants, which police obtained upon arrest or self-identification by that co-defendant, or based upon one or more of the detective's prior knowledge of the identity of that individual.

Yet the statements identifying Rush and his co-defendants were only that—statements

that identified individuals without making direct reference to the relationships among them. They were not statements that had any tendency to incriminate Rush through reference to facts that formed the basis of the charges against him. Cf. Brock, 540 N.E.2d at 1240. Thus, we cannot conclude that the trial court's denial of Rush's objections to the identification of the co-defendants as family members was in error.

Sufficiency of the Evidence

Rush further contends that the trial court erroneously denied his motion for judgment on the evidence at the close of the State's evidence, arguing specifically that there was insufficient evidence of his constructive possession of the cocaine in 4210 Carrollton to support the conviction.[9]

In order for a trial court to grant a motion for a directed verdict, "there must be a total lack of evidence regarding an essential element of the crime, or the evidence must be without conflict and susceptible only to an inference in favor of the innocence of the defendant." Edwards v. State, 862 N.E.2d 1254, 1262 (Ind. Ct. App. 2007) (citing Proffitt v. State, 817 N.E.2d 675, 680 (Ind. Ct. App. 2004), trans. denied), trans. denied. If there is sufficient evidence to sustain a conviction upon appeal, a motion for directed verdict is properly denied. Id. Our standard of review is thus essentially the same as when we review a challenge to the sufficiency of the evidence. Id. Thus, we do not reweigh evidence or judge

---

[9] Rush's appellant's brief argues that there was insufficient evidence of his constructive possession of the cocaine found in the Trailblazer Antwan was driving at the time of his first arrest on March 8, 2010. Rush's reply brief, however, argues this issue with respect to 4210 Carrollton. Because Rush's brother, Antwan, was charged with respect to the Trailblazer, but Rush was not, we construe Rush's argument to apply to the evidence with respect to 4210 Carrollton.

11

witness credibility, and we consider only the evidence that supports the conviction and the reasonable inferences to be drawn from the evidence. Id.

Rush challenges his conviction for Dealing in Cocaine, as a Class A felony. In order to obtain a conviction, the State was required to prove beyond a reasonable doubt that Rush knowingly possessed, with intent to deliver, cocaine in an amount greater than three grams. I.C. § 35-48-4-1(a)(2) & (b)(1); App. 34.

Rush contends only that there was insufficient evidence of his constructive possession of the drugs in 4210 Carrollton. Constructive possession occurs when an individual "'has direct physical control over the item.'" Massey v. State, 816 N.E.2d 979, 989 (Ind. Ct. App. 2004) (quoting Henderson v. State, 715 N.E.2d 833, 835 (Ind. 1999)). "In order to prove constructive possession, the State must show that the defendant has both (1) the intent to maintain dominion and control and (2) the capability to maintain dominion and control over the contraband." Iddings v. State, 772 N.E.2d 1006, 1015 (Ind. Ct. App. 2002), trans. denied.

"The State must demonstrate the defendant's knowledge of the presence of the contraband to prove the intent element." Grim v. State, 797 N.E.2d 825, 832 (Ind. Ct. App. 2003). Where the defendant has possession of the premises where contraband is discovered, but that possession is not exclusive, the defendant's knowledge may be inferred from additional circumstances, and must be "able to reduce the controlled substance to his personal possession." Id. "In a manufacturing type [sic] setting, a defendant's presence does not compel a conviction but it does present a prima facie case of possession." Moore v. State, 613 N.E.2d 849, 851 (Ind. Ct. App. 1993). Additional circumstances that Indiana

12

courts have found to support an inference that a defendant had "'knowledge of the nature of the controlled substances and their presence,'" Gee v. State, 810 N.E.2d 338, 341 (Ind. 2004) (quoting Lampkins v. State, 682 N.E.2d 1268, 1275 (Ind. 1997), modified on reh'g, 685 N.E.2d 698 (Ind. 1997)), include:

> (1) incriminating statements made by the defendant, (2) attempted flight or furtive gestures, (3) location of substances like drugs in settings that suggest manufacturing, (4) proximity of the contraband to the defendant, (5) location of the contraband within the defendant's plain view, and (6) the mingling of the contraband with other items owned by the defendant.

Id.

Rush contends that there was insufficient evidence of his connection to 4210 Carrollton and that observations of Rush at the home and at the Walgreen's are insufficiently specific in terms of time and identity to establish his connection to the cocaine in the home. We do not agree.

With respect to Rush's connection to 4210 Carrollton, the evidence favoring the judgment shows that in 2005, Rush identified 4210 Carrollton as his residence in Bureau of Motor Vehicles ("BMV") documentation, and his brother, Antwan, listed that address as his residence for his own BMV documentation. Detective Terry testified that she knew Antonio before the events of March 8, 2010, and saw him exit and then re-enter the white Malibu that travelled between 4210 Carrollton and the Walgreen store. Detective Terry and numerous other detectives testified that the white Malibu travelled between 4210 Carrollton, the Walgreen store, and the location of the traffic stop where Rush and his brother Antwan were arrested.

13

We turn now to Rush's argument that he was unconnected to the cocaine found in 4210 Carrollton. The first floor of the house was relatively small, with three rooms arranged in a straight line from front to back. The middle room had a couch, chair, and television. In the rear room was a kitchen with a serving window facing the middle room. The middle room on the first floor of the small residence had a shotgun leaning against the wall near the kitchen, and a .38 revolver tucked into the couch with the grip of the pistol protruding from underneath a cushion. In the kitchen, cooking implements with drug residue on them, powder and crack cocaine in various amounts, and baking soda, which cocaine dealers often use to dilute pure or nearly pure cocaine for manufacture and sale, were all in plain view. So too were used surgical gloves, a Walgreen's bag, and a box of Walgreen brand surgical gloves. Rush had purchased gloves from Walgreen that day.

Detectives testified that they observed Rush entering and leaving on numerous occasions a residence to which he was connected and which bore substantial markings of being a drug manufacturing setting, and occupying a vehicle that was used to obtain supplies for that operation. Rush purchased gloves that were then found in the kitchen of the residence, where the drugs were processed and packaged for consumption. Detectives Deddish and Terry testified that they observed upwards of thirty individuals briefly visit 4210 Carrollton, a pattern of conduct that officers testified was indicative of a location where occupants were selling drugs. Upon apprehending Rush during the traffic stop on 46th Street on the afternoon of March 8, 2010, Rush was found in possession of a large amount of cash.

In light of this evidence, we cannot conclude that there was insufficient evidence from

14

which the jury could infer that Rush was connected to the residence and the cocaine found within it.  There was sufficient evidence to support Rush's conviction for Dealing in Cocaine.

### Batson Challenges

Rush contends that the trial court erred when it overruled his objection to the State's use of peremptory challenges to strike two African-American jurors from the venire and denied his subsequent motion for a mistrial.

The Indiana Code provides that, in prosecutions for offenses other than murder, the State may use as many as five peremptory challenges to exclude venirepersons from the jury.  I.C. §§ 35-37-1-3(c) & 35-37-1-4.  Generally, "a peremptory challenge may be [exercised] for no cause whatsoever." Bond v. State, 273 Ind. 233, 237, 403 N.E.2d 812, 816 (1980).  In Batson v. Kentucky, however, the United States Supreme Court qualified that principle to preclude the use of peremptory challenges to exclude venirepersons from a jury solely on the basis of race.  476 U.S 79 (1986), modified by Powers v. Ohio, 499 U.S. 400 (1991) (extending Batson to cases where the defendant and excluded juror were of different races).

In Batson, the Court "determined that the prosecutor's use of a peremptory challenge to strike a potential juror solely on the basis of race violated the Equal Protection Clause of the Fourteenth Amendment." Jeter v. State, 888 N.E.2d 1257, 1262 (Ind. 2008).  Batson set forth a three-step test to determine whether the State has used a peremptory challenge to strike improperly a juror from the venire solely because of that individual's race.  First, the party contesting the use of a peremptory challenge must make a prima facie showing of

15

discrimination based upon race against the member of the venire. <u>Batson</u>, 476 U.S. at 96-97. Next, the party using a peremptory challenge may "present a race-neutral explanation for using the challenge." <u>Jeter</u>, 888 N.E.2d at 1263 (citing <u>Batson</u>, 476 U.S. at 97). If the party seeking to strike a member of the venire provides a race-neutral explanation, "the trial court must then decide whether the challenger has carried its burden of proving purposeful discrimination." <u>Id.</u> (citing <u>Batson</u>, 476 U.S. at 98).

Even a single instance of discrimination because of a venireperson's race is grounds for reversal where a trial court rejects a <u>Batson</u> challenge. <u>Killebrew v. State</u>, 925 N.E.2d 399, 401 (Ind. Ct. App. 2010), <u>trans. denied</u>. Because of the importance of the demeanor of potential jurors and the prosecutor when the trial court evaluates a race-neutral explanation for a peremptory challenge, we afford broad latitude to the trial court's decision in such matters. Thus, we reverse only where the trial court's decision is clearly erroneous. <u>Id.</u>

Here, the trial court raised sua sponte the question of whether the <u>Batson</u> line of cases rendered the State's peremptory challenges improper. Rush contends that the State's use of peremptory challenges to exclude two African-American members of the venire were violations of the Fourteenth Amendment and requests that we reverse his conviction and remand for a new trial. The State argues that Rush waived this issue on appeal and that the peremptory challenges were nonetheless not improperly granted.

While we cannot agree with the State that Rush waived this issue on appeal, we conclude that the trial court did not err when it granted the State's peremptory challenges as to the two African-American members of the venire. Central to Rush's contention that the

16

trial court erred is this court's decision in <u>Killebrew</u>, where we applied the Supreme Court's decision in <u>Snyder v. Louisiana</u>, 552 U.S. 472 (2008), and ordered a new trial. In <u>Killebrew</u>, the State used peremptory challenges to strike all five African-American members of the venire. <u>Killebrew</u>, 925 N.E.2d at 400-401. On appeal, another panel of this court compared the answers given by non-white members of the venire who were stricken from the jury to those of white members of the venire whom the State did not strike. Based upon these comparisons with regard to one of the venirepersons, the <u>Killebrew</u> panel concluded that the trial court erroneously permitted the State to exercise a peremptory challenge in violation of the Fourteenth Amendment, reversed Killebrew's convictions, and remanded the case for a new trial. <u>Id.</u> at 402-403.

The result in <u>Killebrew</u> depended upon changes announced by the Supreme Court's opinion in <u>Snyder</u>. The <u>Snyder</u> Court looked at the prosecutor's use of peremptory challenges to strike five African Americans from the venire, giving close scrutiny to the state's race-neutral reasons for striking potential jurors when those explanations applied equally—if not more urgently—to white jurors whom the state did not seek to strike from the panel. The Court looked not only at the conduct of voir dire itself, but also at the course of the trial as a whole when it reversed Snyder's conviction. <u>Snyder</u>, 552 U.S. at 477-86.

Here, the trial court requested sua sponte that the State explain its peremptory challenges as to the two African-American venirepersons. The State pointed to both individuals' statements that they wanted to be presented with scientific evidence connecting Rush to the drugs at issue in the case or other evidence of actual possession. When the trial

17

court observed that other members of the venire had also expressed that wish, the deputy prosecutor further noted that one of the two potential jurors' brothers was a police officer with whom the deputy prosecutor had worked in the past and she had a bad relationship with him. The deputy prosecutor was therefore concerned that the potential juror might be biased against her. After listening to the State's race-neutral explanations and the defendants' responses, and observing that the State's reasons were of special concern because we had recently reversed the trial court's rejection of a <u>Batson</u> challenge in another case, the trial court granted the State's peremptory strikes. On appeal, Rush contends that the State's race-neutral rationale was pretextual and that the trial court's determination to the contrary was in error.

With an eye toward the record as a whole, as in <u>Killebrew</u> and <u>Snyder</u>, we cannot agree. As to the juror with whose brother the prosecutor had prior dealings, Rush does not point to any disparate treatment of similarly-situated non-blacks on the jury—indeed, our review of the record reveals that several individuals whose close relatives were associated with law enforcement were stricken from the venire. So too were other individuals who, like the other black juror whom the State sought to strike with a peremptory challenge, expressed difficulty with constructive possession, a concept central to the State's case. Moreover, the State sought to strike these venirepersons in the first round of voir dire, and two subsequent rounds of jury selection passed without further event. Finally, the trial court's expressed sensitivity to <u>Batson</u>-related issues and its decision to permit the peremptory strikes after raising those issues sua sponte further weighs against a conclusion that the trial court erred

18

when it granted the State's peremptory challenges over Rush's objection.

In view of the entirety of the trial record and in light of the issues presented at trial, we cannot conclude that the trial court erred when it permitted the State to use its peremptory challenges to strike two African-American members of the venire.

## Conclusion

Rush's Sixth Amendment rights as articulated under <u>Bruton</u> were not infringed upon when police officers testified about the relationships among Rush and his co-defendants. There was sufficient evidence of Rush's connection to the residence and the cocaine found in it for a jury to find him guilty of Dealing in Cocaine. The trial court did not improperly grant the State's peremptory strikes of two African-American jurors from the venire.

Affirmed.

BAKER, J., and DARDEN, J., concur.