[Cite as *State v. Oloff*, 2012-Ohio-6048.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE   COUNTY

STATE OF OHIO                                    :
                                                 :        Appellate Case No. 2012-CA-34
     Plaintiff-Appellee                       :
                                                 :        Trial Court Case No. 11-CR-474
v.                                               :
                                                 :
JEFF C. OLOFF                                    :        (Criminal Appeal from
                                                 :         Common Pleas Court)
     Defendant-Appellant                      :
                                                 :

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of December, 2012.

. . . . . . . . . . .

STEPHEN K. HALLER, Atty. Reg. #0009172, by STEPHANIE R. HAYDEN, Atty. Reg. #0082881, Greene County Prosecutor's Office, 55 Greene Street, Xenia, Ohio 45385
     Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. #0072135, 36 North Detroit Street, Suite 102, Xenia, Ohio 45385
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant Jeff Oloff appeals from his conviction and sentence,

following a no-contest plea, for Illegal Cultivation of Marijuana in violation of R.C. 2925.04(A) and Possession of Criminal Tools in violation of R.C. 2923.24(A). Oloff contends that the search warrant issued for his home was not based upon probable cause and that the evidence found in the home should have been suppressed. We conclude that the search warrant for Oloff's home was based on probable cause, and that the evidence found therein was admissible. Accordingly, the judgment of the trial court is Affirmed.

## I. A Search Warrant Is Issued to Search 698 Sueden Drive

{¶ 2} In 2010 the Beavercreek police department was investigating a series of crimes involving the theft of copper piping. The crimes were eventually traced to a vehicle that was subsequently stopped by the Riverside police department. The woman driving the vehicle admitted her role in the thefts, and also gave information regarding the fact that her accomplice, J.C. Oloff, stored the stolen property at his residence located at 698 Sueden Drive, Beavercreek. The woman also informed the police that a marijuana crop was being grown at that residence. Upon further investigation of the residence, the Beavercreek police proceeded to obtain a search warrant for the residence.

## II. The Course of Proceedings

{¶ 3} Following the search, defendant-appellant Jeff Oloff [1] was arrested and charged by indictment with one count of Possession of Marijuana, one count of Trafficking in Marijuana, one count of Illegal Cultivation of Marijuana and one count of Possession of Criminal Tools. The indictment also contained five forfeiture specifications.

{¶ 4} Oloff moved to suppress evidence. The parties stipulated two exhibits: the

---

[1] Jeff Oloff is the father of the theft suspect, J.C. Oloff.

search warrant and the affidavit in support thereof, as evidence in connection with the motion, and both parties submitted briefs on the merits. The affidavit in support of the search warrant averred, in pertinent part, as follows:

That the facts upon which the Affiant bases said beliefs are:

1. The Affiant, Detective Nick Amato, is employed by the Beavercreek Police Department and has been a sworn officer for the past five (5) years. During his tenure with Beavercreek Police Department, Det. Amato has been involved in numerous criminal investigations involving drug trafficking violations that have led to successful prosecution. Det. Amato is a trained Evidence Technician and has attended several advanced law enforcement training seminars. Det. Amato has completed the Miami Valley Regional Basic and Advanced Drug Investigation School.

2. The Beavercreek Police Department Detective Section has been investigating several Breaking and Entering reports over the past several weeks involving a suspect or suspects that were breaking into dwellings and removing copper water pipes and/or copper fuel pipes. Independent investigative efforts conducted by members of the Beavercreek Police Department identified a potential suspect named J.C. Oloff as committing the criminal activity and that Oloff was utilizing a 2002 Honda CRV bearing Ohio license DMU 2746 during the theft offenses.

3. On November 11, 2010 Det. Rodney Curd, Beavercreek Police Department, obtained a court order from the Honorable Cynthia Heck to conduct electronic surveillance of the 2002 Honda CRV bearing Ohio license DMU2746. Law enforcement officials from Beavercreek Police Department conducted electronic and

physical surveillance of the 2002 Honda CRV from November 11, 2010 until November 15, 2010.

4. On November 15, 2010 at approximately 12:38 AM the Honda CRV was monitored by law enforcement officials as it traveled in a neighborhood in the City of Riverside near Spinning Road, Montgomery County, Ohio. Law Enforcement Officials from Dayton Police Department, Riverside Police Department, and Beavercreek Police Department saturated the area in attempts to locate the suspect or suspects committing the theft offenses. At approximately 1:00 AM on November 15, 2010 a Detective Jim Vance, Riverside Police Department, observed Oloff in possession of copper pipe and a flat screen TV that Det. Vance was able to determine was stolen from 866 Wagon Wheel which was a short distance from where Oloff was contacted by Det. Vance.

5. The 2002 Honda CRV was located in a business parking lot near the intersection of Spinning Road and Burkhardt Avenue and occupied by a female driver named Ann M. Ranberger. Ranberger was taken into custody and admitted driving Oloff while he committed multiple burglaries in the greater Greene and Montgomery County area over the past several weeks. Ranberger admitted taking Oloff to the scrap yard following the thefts and selling the copper that was stolen from the various dwellings.

6. Ransberger also admitted that Oloff would at times store stolen property at his residence at 698 Sueden Drive, Beavercreek, Greene County, Ohio. Ransberger stated that many times Oloff would store copper that he had stolen in a trash can

located on the side of the dwelling at 698 Sueden drive. Ransberger stated that inside the residence at 698 Sueden Drive is an indoor marijuana grow that is currently in harvest stage. Ransberger stated the grow had approximately sixty mature plants. Ransberger stated that Oloff utilizes a flat head screw driver to break into dwellings.

7. On November 16, 2010 Det. Ron Gudgell obtained a subpoena from the Greene County Common Pleas Court Grand Jury for subscriber information from the Dayton Power and Light Company for utility consumption of electricity at 698 Sueden Drive, Beavercreek, Ohio and for comparison consumption purposes at 692 Sueden Drive and 705 Sueden Drive, Beavercreek, Ohio. The dwellings at 692 Sueden Drive and 705 Sueden Drive, Beavercreek, Ohio were similar in size to 698 Sueden Drive. On November 16, 2010 the Affiant received information from the Dayton Power and Light Company for consumption records for the listed addresses for the period of time encompassing one year from November 2009 to November 2010. The information received showed that 698 Sueden Drive significantly surpassed the comparison addresses and at times more than doubled the consumption level of electricity at the comparison addresses. Dayton Power and Light records indicate that Jeffrey C. Oloff as [sic] the subscriber at 698 Sueden Drive. The Affiant knows through prior training and experience that indoor marihuana growing operations consume unusually high amounts of electricity in order to power the high intensity lamps and fans necessary to facilitate proper conditions for manufacturing or growing marihuana plants. The consumption of electricity listed for 698 Sueden Drive is indicative of a dwelling conducting a marihuana grow operation and the electricity consumption levels are

consistent with the usage of high wattage indoor equipment needed in an indoor marihuana growing operation. The Affiant has no information indicating the presence of tools, swimming pools, hot tubs, alternate heating or other equipment that would explain the large amount of electricity being used for the residence of 698 Sueden Drive, Beavercreek, Greene County, Ohio.

8. Based on the aforementioned experience, the Affiant is familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and knows the following:

a. It is common practice that drug traffickers and drug distributors hide their addresses, their telephone and beeper/pager services by using other person's names in order to avoid discovery by law enforcement officials;

b. It is common practice that drug traffickers and drug distributors often maintain residences which are used as stash houses or locations for drug storage and distribution and use nominees to obtain telephone service, utility service, et cetera, once again to hide the true identity of the owner or person who will use that service;

c. That drug traffickers and drug distributors often place assets in corporate entities in order to avoid detection of those assets by exercising dominion and control over them;

d. It is common practice that even though these assets are in nominee names, drug traffickers and drug distributors continue to utilize these assets by exercising dominion and control over them;

e. It is common practice that drug traffickers and drug distributors maintain on

hand large amounts of U.S. currency in order to finance their ongoing drug business;

f. It is common practice that drug traffickers and drug distributors maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs; drug traffickers and drug distributors commonly front (provide drugs on consignment) to their clients; that the aforementioned books, records, receipts, notes, ledgers, et cetera, are maintained where the drug traffickers and drug distributors have ready access to them;

g. That it is common for drug traffickers and drug distributors to provide false information to law enforcement officials regarding their identity and the actual address of their residence;

h. That it is common for drug traffickers and drug distributors to conceal drugs, contraband, proceeds of drug sales, at locations within their residences and/or their businesses and within vehicles located at their residences and/or businesses from law enforcement officials;

i. That persons involved in drug trafficking and drug distribution conceal in their residences and businesses, drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the obtainment and concealment of large sums of money acquired from engaging in drug trafficking and drug distribution activities;

j. That when drug traffickers and drug distributors amass large proceeds from the sale of drugs, the drug traffickers and drug distributors attempt to legitimize

(launder) these profits; that to accomplish these goals, drug traffickers and drug distributors many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, letters of credit, et cetera; that other entities used to launder monies include real estate firms and purported legitimate business fronts;

k.   It is common practice that drug traffickers and drug distributors commonly travel to purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, the traffickers and drug distributors would transport, or cause to be transported, drugs to areas in which they will distribute the drugs; and that the methods of transportation include, but are not limited to, commercial airlines and rental and private automobiles;

l.   It is common practice that drug traffickers and drug distributors commonly maintain addresses or telephone numbers in books and documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking and drug distribution organizations;

m.   That drug traffickers and drug distributors take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at their residences and/or businesses of traffickers and drug distributors;

n.   That drug traffickers and drug distributors have in their possession, (that is on their persons, at their residences, and/or their businesses), firearms, including but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, knives, and

other weapons; that said firearms are used to protect and secure a drug trafficker's and drug distributor's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, U.S. currency, et cetera;

o. That drug traffickers and drug distributors frequently maintain hidden compartments within their residences and vehicles, as well as bury drugs, money, and other items of evidence in containers such as shoe boxes, in safes, or hidden compartments inside the residences;

p. That the exact quantities, prices, date, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief, and often in code, understood by the traffickers and drug distributors, but designed to mislead or confuse non-participants of the conversations; that drug traffickers and drug distributors make extensive use of cellular phones, text messaging, beepers/pagers to facilitate contacting one another such as calling a beeper/pager and then inputting the number that should be called and even, perhaps, adding additional instructions in the form of additional digits; that the structure of a drug distribution organization involving marijuana and/or cocaine usually consist of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move it to a location other than where he/she sells it to the wholesale

distributors. The location of the source of supplies so-called "stash house", is generally a well guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials, and weighing equipment, are usually kept at the "stash house" and only those amounts needed for immediate sale are kept at the point of sale;

q. That drug traffickers and drug distributors frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business .

V. The Affiant further states that he has good reason and probable cause to believe that within the residence, described above, will be evidence of the violations of the Ohio Revised Code described in Paragraph "I" of the search warrant.

\* \* \*

**{¶ 5}** The search warrant stated in Paragraphs I - III that there is probable cause to believe that certain described items of property connected with the commission of the offenses of Possession of Drugs, Trafficking in Drugs, Possession of Criminal Tools, Receiving Stolen Property, Illegal Manufacture of Drug or Cultivation of Marihuana and Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs would be found at the Sueden Drive property.

**{¶ 6}** Upon review of the affidavit, the trial court noted that the "basis asserted for probable cause by the State was derived from two sources, information from an identified informant and residential utility usage information." The trial court went on to state as follows:

In this case, the informant, while in custody, told law enforcement the location of an alleged marijuana grow site, explained in which stage the grow was, and even estimated the number of mature plants they could expect to find. The informant also stated that the address she provided was the residence of the suspect in the separate case, that she had been driving him while he committed multiple burglaries over the past several weeks, and that he would store stolen property at that address. The level of detail in the information she provided is highly indicative of personal knowledge and, along with the fact she was making statements against penal interests at the time with respect to another investigation, all weigh in favor of the reliability of the information and her credibility.

* * *

Law enforcement did not rest solely on the statements of the informant. After receiving the information, officers then endeavored to corroborate it by obtaining utility usage data on the address provided by the informant. * * * [T]he consumption level of the subject address was substantially higher than that of the comparison dwellings and led to the Affiant's qualified conclusion that it was indicative of a marihuana grow. This information thereby corroborated that which was provided by the informant. Dkt. 30, P. 4-5.

{¶ 7} The trial court went on to conclude that under the totality of the circumstances, there was a substantial basis for the magistrate's decision to issue the warrant, and thus overruled the motion to suppress. Thereafter, Oloff entered a plea of no contest to

the charges and was sentenced to a term of five years of community control.

{¶ 8}    Oloff appeals from his conviction and sentence.    His sole assignment of error is as follows:

THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS.

### III.    The Search Warrant in this Case Was Supported by Probable Cause

{¶ 9}    Oloff contends that the trial court should have suppressed the evidence obtained during the execution of the search warrant.    He contends that the affidavit submitted in support of the search warrant was deficient.    Specifically, he argues that the affidavit fails to establish a nexus between the original theft investigation and himself.    He further argues that the woman who provided the information to the police was not reliable and had no factual basis for her allegations.    He also contends that she failed to indicate that the marijuana was presently on the premises.    Finally, he contends that the affidavit omits relevant information relating to the police investigation of the residence – specifically the information gleaned from DP&L.

{¶ 10}    The Fourth Amendment protects individuals from an unreasonable search in their homes. See *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Police may not enter one's home to perform a search or to seize without a warrant, absent consent or exigent circumstances. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

{¶ 11}    In determining the existence of probable cause from an affidavit submitted to support a search warrant, the issuing magistrate must " 'make a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George,* 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus. An affidavit in support of a search warrant must set forth all facts that led the affiant to believe that the items are at the place to be searched. *Akron v. Williams*, 175 Ohio St. 186, 192 N.E.2d 63 (1963).

**{¶ 12}** A search warrant's supporting affidavit has a presumption of validity. *State v. Roberts*, 62 Ohio St.2d 170, 178, 405 N.E.2d 247 (1980). A reviewing court does not conduct a de novo review of a magistrate's determination of probable cause, but rather determines whether the magistrate "had a substantial basis for concluding that probable cause existed." *George* at paragraph two of the syllabus. Probable cause means that there is a "probability, and not a prima facie showing, of criminal activity." *Id.* at 329.

**{¶ 13}** We turn first to Oloff's complaint that the affidavit fails to establish a nexus between himself and the original theft investigation. In this case, the affidavit establishes that an investigation was being conducted regarding copper pipe thefts and that the perpetrator and his accomplice were apprehended. It further establishes that the accomplice admitted her role in the copper pipe thefts and proceeded to establish that J.C. Oloff had been storing some of the stolen goods at the Sueden Drive residence. She further alleged that she was aware that approximately sixty marijuana plants were being grown at that residence and that the plants were ready to harvest.

**{¶ 14}** While it is true that this information does not establish a nexus between the

defendant and the copper pipe thefts, that is immaterial. The information in the affidavit, in its totality, established probable cause to believe that evidence of marijuana cultivation could be found at the residence, which was the evidence and the place of the search authorized by the search warrant.

{¶ 15} As noted above, the police obtained electricity usage records for the residence as well as two other residences on the street. The three residences were comparable in size, but the Oloff residence was using significantly more electricity than the other two. The affidavit goes on to state that, based upon Detective Amato's training and experience, he was of the opinion that the consumption of electricity at Oloff's residence was "indicative of a dwelling conducting a marihuana grow operation," and that it is "consistent with the usage of high wattage indoor equipment needed" for a marijuana grow operation.

{¶ 16} The information contained in the affidavit supported a finding, by the magistrate, of probable cause to believe that evidence of the cultivation of marijuana could be found at the residence

{¶ 17} We next address the claim that Ranberger was not a reliable informant and that she failed to establish that there was a crime presently occurring at the residence. Oloff contends that nothing in the affidavit makes reference to Ranberger as a "known source of information, a reliable confidential informant or having provided law enforcement with information in the past."

{¶ 18} When assessing the reliability of information received from an informant, Ohio courts have generally recognized three categories of informants: (1) the identified citizen informant, (2) the known informant, i.e., someone from the criminal world who has a history

of providing reliable tips, and (3) the anonymous informant. *State v. Jordan,* 104 Ohio St.3d 21, 2004–Ohio–6085, 817 N.E.2d 684, ¶ 36. "An anonymous informant is generally regarded as comparatively unreliable, and his tip, therefore, will ordinarily require independent and objective corroboration. Ohio courts have generally accorded the identified citizen informant greater credibility. * * * Information from an ordinary citizen who has personally observed what appears to be criminal conduct carries with it indicia of reliability, and is therefore presumed to be reliable." *State v. Reed,* 2d Dist. Montgomery No. 23357, 2010–Ohio–299, ¶ 44. (Citations omitted.)

{¶ 19} Furthermore, "an affidavit in support of a search warrant must present timely information and include facts so closely related to the time of issuing the warrant as to justify a finding of probable cause at that time." *State v. Ingold,* 10th Dist. Franklin No. 07AP–648, 2008–Ohio–2303, ¶ 22. (Citation omitted.) The test for staleness is simply "whether the alleged facts justify the conclusion that contraband is probably on the person or premises to be searched at the time the warrant issues." *Id.* (Citation omitted.)

{¶ 20} In this case, Ranberger does not fall neatly into one of the above categories of informants. She was under investigation for the copper pipe thefts and was making a statement against her penal interest when she also informed the police about the marijuana located at the residence where she knew J.C. Oloff had been storing stolen goods. She informed the police that the marijuana "is currently in harvest stage," and that there were "approximately sixty mature plants." As noted by the trial court, "the level of detail in the information she provided is highly indicative of personal knowledge and, along with the fact that she was making statements against penal interest at the time with respect to another

investigation, all weigh in favor of the reliability of the information and her credibility." We agree. And again, the police did not rely solely on Ranberger's information, but proceeded to investigate further by obtaining the DP&L records. We conclude that the trial court did not err in concluding that Ransberger's information, which was corroborated by the energy usage records, was sufficiently reliable to be included in a determination of probable cause.

{¶ 21} Finally, Oloff contends that the affidavit failed to include information relevant to the DP&L records for the three homes for which the records were obtained. Specifically, he claims that the affidavit is deficient because it contains no information regarding the number and age of residents in the homes, whether the basements of the residences were in use, the level of insulation in the homes, or whether the homes had alternate forms of power. He further notes that there is no information to indicate that the police made contact with any of the residents of the homes. Finally, Oloff notes that while the affidavit does aver that the affiant had no knowledge regarding the "presence of tools, swimming pools, hot tubs, alternate heating or other equipment that would explain the large amount of electricity being used" for the Oloff residence, it also does not show "the lack of existence of any or all of said items."

{¶ 22} This argument ignores the fact that the affidavit was not required to meet the "beyond a reasonable doubt" standard of proof. The affidavit established that Ranberger informed the police of the grow, that the police obtained energy usage records for three comparably-sized homes, and that the discrepancy between the Oloff residence's usage and that of the other two residences was, in his experience (which was extensive), "consistent with" the usage of equipment necessary for an indoor marijuana operation. The fact that the

energy records tended to corroborate Ranberger's claims could lead a reasonable person to conclude that there was a fair probability that marijuana was being grown at the Oloff residence.

{¶ 23}   We conclude that the trial court did not err in finding that the affidavit in support of the search warrant established probable cause for the issuance of the search warrant.   Thus, the trial court did not err in denying the motion to suppress.   Accordingly, Oloff's sole assignment of error is overruled.

## IV.   Conclusion

{¶ 24}   Oloff's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and HALL, JJ., concur.

Copies mailed to:

Stephen K. Haller
Stephanie R. Hayden
Jay A. Adams
Hon. Michael A. Buckwalter